1997 OK 140

**STATE of Oklahoma ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,**

v.

**James Joseph GRAY, Respondent.**

**No. SCBD 4262.**

Supreme Court of Oklahoma.

Nov. 4, 1997.

Allen J. Welch, Oklahoma Bar Association, Oklahoma City, for Complainant.

John E. Douglas, Clark, Stakem, Wood & Douglas, P.C., Oklahoma City, for Respondent.

HARGRAVE, Justice.

¶ 1 The Respondent is before us in a Rule 6 proceeding based joint stipulation of facts and recommendation of discipline of suspension for four years. Having reviewed the record *de novo* we adopt the findings of fact of the Trial Panel, but impose the more severe discipline of disbarment.

¶ 2 James Joseph Gray, OBA # 3551, is a member of the Oklahoma Bar Association with an official roster address of P.O. Box 75662, Oklahoma City, Oklahoma 73147–0662. Respondent was a member of the Illinois Bar Association from 1977 until his joining the Oklahoma Bar Association in 1982.

¶ 3 The Respondent was a shareholder and partner in an Oklahoma city law firm from November 13, 1992 through August 14, 1996. The partnership agreement of the firm provided that all attorney fees earned by any partner were the property of the firm and that any income earned by the partners from any legal activity was to be considered income of the firm, and the partners were not allowed to do work outside the firm. The Oklahoma Bar Association filed a three-count complaint against the Respondent involving Respondent's misappropriation of funds and obtaining a loan from a client without advising the client to obtain independent counsel in the matter.

¶ 4 As noted at the outset, the Respondent has stipulated to the conduct set out in the three-count complaint and has agreed to accept discipline in the matter. The only testimony offered, except for one witness called by the Trial Panel, was that of the Respondent and there is no dispute as to the evidence. While we are not bound by the findings of fact, conclusions of law, or recommendations as to discipline, but must review the matter *de novo,* we have done so in the instant case and have accepted the stipulated facts as presented. Accordingly, the only issue before us is the amount of discipline to be imposed.

¶ 5 Count I states that on November 16, 1995, the Respondent received $7,000.00 from David and Delores Evans, comprised of $2,000 advanced toward costs and a retainer of $5,000 attorney fee. The Respondent deposited all funds in his personal bank accounts and applied the funds toward personal expenses. The Respondent did not notify his firm of receipt of the funds, and he did not advise client or the firm of deposit of the funds in his personal bank accounts. The Respondent testified that, as of the date of the hearing, he probably had performed work equal to the $5,000 retainer, but that the costs incurred to date were only about $500.00. The Respondent continues to represent the Evanses, who are satisfied with the professional services they have received from him and have not complained to the Oklahoma Bar Association. The Trial Panel found that Respondent's conduct violated Rules 1.15(a) and (b), and Rule 8.4(c) of the Oklahoma Rules of Professional Conduct, and Rule 1.4(b) of the Rules Governing Disciplinary Proceedings.

¶ 6 Regarding Count II, Respondent admits that he misappropriated for his personal use $23,675.00 for in attorney fees and costs that belonged to the firm. This appears to be an amount calculated between the complainant and respondent for the sake of the hearing, rather than accurately reflecting the actual amounts that may have been involved. The exact amount of money misappropriated by the Respondent from the firm over a more than two-year period has not been calculated, and may be incapable of calculation due to poor record-keeping on Respondent's part.

¶ 7 The Respondent testified that the amount misappropriated possibly could be offset, at least partially, by retainers kept by the firm after he left the firm. One of the other partners testified that the firm had not been able to calculate the total amount misappropriated by the Respondent, but believed that it could be significantly more than the $23,675.00 admitted.

¶ 8 The Trial Panel found that the Respondent engaged in a pattern of conduct designed to conceal from the clients and the firm his misappropriation of firm funds. That pattern included incidents where Respondent initially misappropriated firm funds received from one client and later, by misap-

propriating funds received from yet another client, would credit payments to the first client. The Respondent has never made any formal claim to the firm for any offset. The Trial Panel found and the Respondent acknowledged that the firm had expended time and energy necessary to communicate with clients, review files and balance accounts.

¶9 The Trial Panel found that Respondent's conduct in Count II violated Rules 1.15(b) and Rule 8.4(c) of the Oklahoma Rules of Professional Conduct.

¶10 Count III involved a loan from James A. Burgan and Collette M. Burgan. On January 27, 1993, during the course of an attorney/client relationship, the Respondent borrowed $15,000.00 from Mr. and Mrs. Burgan and executed a promissory note evidencing the loan. The Respondent asked the Burgans to keep the loan "confidential" from the firm. The Respondent did not advise Mr. and· Mrs. Burgan to seek advice of independent counsel and this forms the basis for the Bar's complaint in Count III. The Respondent defaulted on the note after making a few payments, but he has not entered into any arrangement for repayment of the unpaid portion.

¶11 The Trial Panel found that Respondent's conduct violated Rules 1.8(a)(2) and (3) of the Oklahoma Rules of Professional Conduct.

¶12 The Respondent has not been disciplined previously. The Trial Panel recognized that during this time period the Respondent was suffering from family problems and financial difficulties.[1] The Trial Panel recommends that the Respondent be suspended *for a minimum period of four years* and ordered to pay the costs of the proceeding.

¶13 It was agreed between the parties that the only testimony taken at the hearing would be from the Respondent. The Trial Panel called the firm's managing partner to testify. Respondent's testimony revealed that he knowingly and intentionally diverted cases and money from the firm and that he does not really even believe that he owes the $23,675 to the firm because he continued to assert that the amounts he took were offset by amounts owed him by the firm subsequently. Respondent has not made an accounting to the firm and his answers were vague as to how he had determined how much money was diverted from the firm and as to whether he could be of any assistance in helping the 'firm determine the extent of his defalcation.

¶14 The Respondent testified that the firm operated on the honor system and that it was each attorney's responsibility to get new files entered into the firm's billing system. The routine procedure for opening a new client file was that an interview sheet would be completed and the secretaries would create a file and assign a client identification number. The attorneys would turn in their time records to the secretary that had the responsibility for billing that file, and the secretary would bill the client on behalf of the firm.

¶15 In Respondent's case, he testified that when a new client would come into his office, he would simply make the new file himself and keep it in an unmarked red folder and would work on that case just as any other case, even to the extent of having the firm's secretaries do typing in the case. The case was simply never given a billing number, and Respondent would usually bill the client from the firm, or in a couple of instances, from his home computer. When checks mail came in on those cases, he obtained the checks and deposited them into his personal accounts and used the money to catch up on his bills, house payments and the like. The Respondent was caught only after being away from the office on vacation when one of the other partners did some work in a case and discovered that a firm file never had been created. Upon Respondent's return he was confronted by the partners and, having no satisfactory explanation, immediately left the firm.

¶16 Mr. Gray testified at the hearing about his actions:

"Q. In regards to paragraph 20, can you please elaborate as to exactly how you

1. The Trial Panel offered, by way of mitigation, the observation that when Respondent's deeds were discovered, he did not attempt to mislead the bar and that when he left the firm he lost his financial investment in the partnership (approximately $8,000).

'intentionally concealed diversion of firm funds from the clients and the firm?'

"A. Yes. I maintained pretty close contact with my clients. When mail came in, like I said, we were on an honor system, if I received a check from a client, typically, what I began doing was to take those funds, cash the check myself, take what I needed to pay bills to keep myself afloat, and then what I began to do was apply it to another client's account, make a—perhaps get a money order.

"In the case of one client . . . I obtained some money orders. I put, I know in a couple of instances, the client's name on the money order, identified their address, and made those deposits myself."

¶ 17  The Respondent testified that a different couple named Burgan had given him $1000 to hire attorneys in Missouri in a collection case. The Respondent cashed that check and never paid the Missouri attorneys. The Burgans ultimately sent another check for $1000.00 to the Missouri attorneys.

¶ 18  Despite admitting that he had misappropriated at least $23,675 from the firm in more than 20 instances, when questioned whether there were other amounts possibly owing to the firm, Mr. Gray replied:

"That's right. But I'm not saying I owe $23,000 to the firm right now, because I think there are some credits and offsets.
Q:  And you acknowledge that you understand that the firm disputes that, and they think that you probably owe more than $23,000 . . . ?
A:  That's what I understand."

¶ 19  Trial Panel member Mr. Dixon expressed the panel's concerns that although there was a stipulation as to the $23,675.00 misappropriated, the Respondent was not really admitting that he owed that amount of money. Mr. Welch, attorney for the Bar, maintained that offset was not a defense to the charge and that the proper time for the Respondent to have raised the amount of any offset had passed.

¶ 20  In response to questioning from trial panel member Mr. Jacobus about the basis used for arriving at the $23,675 figure, Mr. Welch answered, essentially, that it was more expedient to proceed with that figure.[2]

¶ 21  The Trial Panel found that Respondent violated Rule 1.15(a) and (b), Rule 8.4(c) and Rule 1.8(a)(2) and (3) of the Oklahoma Rules of Professional Conduct, as well as Rule 1.4 of the Rules Governing Disciplinary Proceedings.

¶ 22  Rule 1.15(a) and (b), the rule concerning safekeeping property, provides:

"(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state where the lawyer's office is situated, or elsewhere with the written consent of the client or third person. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that

2.  Mr. Welch explained how they arrived at the $23,675.00 figure: "The firm provided us with the names of 40-odd open files which they thought were worthy of attention. Jim Strong, . . . our investigator, took that list to visit with Mr. Gray and Mr. Douglas [Respondent's attorney]. They provided us with 69 files. But we have not arrived at any figure, conclusively. And we're aware of that . . . and perhaps that would raise some concern by the Trial Panel and the court.

"On the other hand, we do have a stipulation of at least $23,675. We concluded that we could invest tens and tens of hours and postpone this proceeding for six or nine or 12 months, before all of this is calculated with any specificity, and that when all is said and done, if it's agreed that he's misappropriated at least $23,000, for purposes of a violation of the Rule of Professional Conduct, is there any distinction between that and $29,000 or $31,000? So I appreciate your concern, but his is something that Mr. Douglas and I have discussed, and we thought we'd present these stipulations to you with that ambiguity."

the client or third person is entitled to receive, and upon request by the client or third person, shall promptly render a full accounting regarding such property."

¶ 23   Rule 8.4(c) provides that it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

¶ 24   Rule 1.8(a)(2) and (3) of the ORPC provides:

(a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

(2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and

(3) the client consents in writing thereto.

Rule 1.4(b), Rules Governing Disciplinary Procedure provides:

(b) Where money or other property has been entrusted to any attorney for a specific purpose, he must apply it to that purpose. He may not avail himself of a counterclaim or set-off for fees against any money or other property of his client coming into his hands for such specific purpose, and a refusal to account for and deliver over such money or property upon demand shall be deemed a conversion.

¶ 25   The foregoing rules make it clear that Respondent faces very severe allegations of misconduct. The rules require that funds belonging to clients or third persons coming into a lawyer's possession in connection with a representation must be kept in separate from the lawyer's own property and in a separate account. Complete records shall be maintained and preserved by the lawyer for as long as five years after the representation ends. Further, the rules require that a lawyer must promptly notify the client or third person upon receiving fund in which a client or third person has an interest, and shall, upon request by the client or third person, promptly render a full accounting. The Respondent did none of these.

¶ 26   As to Respondent's former law firm, it is clear that the case involves far more than a dispute between attorneys about their fees. Respondent's stipulated conduct reveals that he knowingly in engaged in acts of dishonesty toward the firm. We have discussed the difference between a fee dispute and misconduct. *In re Beveridge,* 188 Okla. 178, 106 P.2d 1104, 1107 (1940), concerned the sale of a solo practice to a lawyer who formed a partnership with another lawyer and a dispute over division of fees in a case involving the solo practitioner, the purchaser of the practice, the purchaser's partner and a lawyer in California who had worked on the case. In that matter we said:

"Our holding herein is not to be construed that honest disputes involving division of fees between associated attorneys or partners are subject to disciplinary proceedings before the State Bar Associations. Such organization is not to be used for avenging a private grudge or as a collection agency. *But where it is shown that an attorney, with dishonest motives, has denied his obligations to his partner and to an associated attorney, he is subject to disciplinary action.*" emphasis added.

¶ 27   Regarding the clients, it is clear that Respondent converted funds advanced for attorney fees and costs to his personal use, in violation of the rules. What may have been the Respondent's original intention is unimportant. In *Oklahoma Bar Association v. Perkins,* 757 P.2d 825 (Okla.1988), we rejected Mr. Perkins argument that he did not convert client funds because he did not have an intent to "inflict injury" on his clients and that money was always available to return to his clients stating:

"Lawyers who 'borrow' may, it is true, be less culpable than those who had no intent to repay, but the difference is negligible in this connection. Banks do not rehire tellers who 'borrow' depositor's funds ... The overwhelming majority of misappropriation cases involve lawyers who undoubtedly intended to return the funds. They misappropriate initially with precisely such intent. Anticipated money for repayment fails to materialize. Other clients' trust funds are then used for 'restitution' and the initial embezzlement spawns many more. Wholesale exemption from strict discipline for misappropriation would result if such 'borrowing' were excused."

¶ 28 We said that Perkins' actions in depositing client's funds into his personal account, utilizing a client's funds to pay a personal loan, the unauthorized use of clients' funds, and the difficulties experienced by two clients in regaining their funds, demonstrated that Perkins' misconduct was overwhelming and warranted disbarment.

¶ 29 The Respondent in the case at bar, while expressing remorse for his conduct, has admitted misappropriating client and firm funds to his own use. In *Oklahoma Bar Association v. Raskin,* 642 P.2d 262 (Okla. 1982), Mr. Raskin had urged that disbarment in his case was inappropriate because of his otherwise unblemished legal career, the presence of great financial stress and his willingness to make restitution. We said in that case that the fact of one's outstanding prior record as a lawyer seemed less important where misappropriation is involved, and that the mere circumstance of restitution was likely to be fortuitous and depended upon conditions and circumstances that afford no reliable test of a person's moral fitness as a lawyer. We observed that our task is to protect the public and preserve the public confidence in the legal profession and in the judiciary that licenses them. The relationship between lawyer and client calls for the highest degree of integrity and fidelity. Nothing less can be tolerated.

¶ 30 Likewise, in the case at bar we find that the Respondent's conduct warrants disbarment. The Trial Panel found that the Bar had demonstrated the truth of its allegations against the Respondent by clear and convincing evidence. We agree. The Trial Panel felt that although the Respondent suffered financial and family problems, these factors were insufficient to counter the allegations against him. Offered in mitigation is Respondent's previously unblemished career. As noted above, an unblemished prior record is of less importance where misappropriation is involved. The parties agreed to imposition of a four-year suspension. The Trial Panel recommended that the Respondent be suspended for a minimum period of four (4) years. We do not accept the parties' agreed recommendation of suspension of four years.

¶ 31 As noted above, Respondent's actions in using money belonging to the firm for his own personal expenditures involved more than a division-of-fees dispute between law partners. If Respondent had been a sole practitioner his actions would not be condoned. The money that the Respondent took did not belong to him and his conduct was dishonorable and dishonest in two respects: he took money from his clients and from his firm and used it for his own purposes.

¶ 32 The Oklahoma Bar Association moved to assess costs of the proceeding against the Respondent in the amount of $591.03. The application to assess costs is granted and the Respondent is ordered to pay the costs of this proceeding in the amount of $591.03 within ninety (90) days of the date this opinion becomes final.

¶ 33 Accordingly, it is ordered that the respondent be disbarred and his name stricken from the roll of attorneys.

**RESPONDENT IS DISBARRED AND HIS NAME IS ORDERED STRICKEN FROM THE ROLL OF ATTORNEYS. RESPONDENT ORDERED TO PAY COSTS OF $591.03.**

KAUGER, C.J., and HODGES, LAVENDER, ALMA WILSON and WATT, JJ., concur.

SUMMERS, V.C.J., and SIMMS and OPALA, JJ., concur in part and dissent in part.